**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

IN RE: ENZYMOTEC SECURITIES
LITIGATION

Civil Action No.: 14-5556 (JLL) (MAH)

**OPINION**

---

**LINARES**, District Judge.

This matter comes before the Court by way of Defendant Enzymotec Ltd. ("Enzymotec"
or the "Company"), the Officer Defendants, and the Director Defendants'[1] (collectively
"Defendants") Motion to Dismiss the Amended Class Action Complaint (the "Amended
Complaint" or "AC"). (ECF No. 36.) In this action, Lead Plaintiffs David R. Raabe, David E.
Raabe, and Yehuda L. Danon (collectively "Lead Plaintiffs") allege claims under §§ 10(b) and
20(a) of the Securities Exchange Act of 1934 (the "Securities Exchange Act") and §§ 11, 12(a)(2),
and 15 of the Securities Act of 1933 (the "Securities Act"),[2] arising from alleged fraudulent
misrepresentations about the viability of Enzymotec's business, the strength of its customer
relationships, and the sales visibility that these relationships provided.

The Court has considered the parties' submissions and decides this matter without oral

---

[1] The Officer Defendants are Ariel Katz ("Katz") and Oren Bryan ("Bryan"), Enzymotec's CEO and CFO,
respectively. (AC ¶¶ 22-23.) The Director Defendants are: Jacob (Yaacov) Bachar ("Bachar"), Nir Belzer ("Belzer"),
Yoav Doppelt ("Doppelt"), Steve Dubin ("Dubin"), Dov Pekelman ("Pekelman"), Yossi Peled ("Peled"), Imanuel
Wasserman ("Wasserman"), Yossi Ohana ("Ohana"), Gilead Fortuna ("Fortuna"), Michal Silverberg ("Silverberg"),
Joseph Tenne ("Tenne"). (*Id.* ¶¶ 148-58.) The Officer Defendants and Director Defendants are collectively the
"Individual Defendants."

[2] The § 10(b) and Rule 10b–5 claims are asserted against Enzymotec and the Officer Defendants (AC ¶¶ 124-32); the
§ 20(a) claim is asserted against the Officer Defendants (*id.* ¶¶ 133-38); the § 11 claim is alleged against all Defendants
(*id.* ¶¶ 169-81); the § 12(a)(2) claim is alleged against Enzymotec (*id.* ¶¶ 182-89); and the § 15 claim is alleged against
the Individual Defendants (*id.* ¶¶ 190-95).

argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court grants in part and denies in part the Motion to Dismiss.

## FACTUAL BACKGROUND[3]

### A. Enzymotec's Nutrition Business

Enzymotec is a global supplier of lipid-based specialty nutritional and medical food products and solutions.  (AC ¶¶ 26-27; ECF No. 36-1, Declaration of Richard H. Zelichov ("Zelichov Decl."), Ex. B ("IPO Prospectus") at 49, 71.)  Enzymotec was founded in 1998, and is headquartered in Migdal Ha'Emeq, Israel, where it maintains its sole research and development laboratory and manufacturing facility.  (AC ¶ 20; IPO Prospectus at 17.)  Enzymotec launched its first product in 2003 and, as of its IPO in September 2013, had designed and developed twelve products generating sales in over thirty countries.  (IPO Prospectus at 1, 49.)  However, Enzymotec's revenues are derived mostly from its Nutrition segment, comprised mainly of two products which are at the center of the Amended Complaint: InFat (an infant formula ingredient), and krill oil products for the omega-3 fatty acid market.  (AC ¶ 26.)

InFat is a nutritional ingredient that, when incorporated into baby formula, allows its fat composition and structure to more closely resemble human breast milk, which is considered the "gold standard" in infant nutrition.  (AC ¶ 29; IPO Prospectus at 49.)  Enzymotec manufactures an enzyme that it exclusively supplies to AAK, a Sweden-based global producer of specialty oils; AAK then mixes the enzymes with other raw materials at is facilities in Karlshamn, Sweden to

---

[3] This background is derived from Plaintiff's Amended Complaint, which the Court must accept as true at this stage of the proceedings, and other documents that are integral to and/or explicitly relied upon in the Amended Complaint, such as SEC filings, press releases, and earnings call transcripts. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009); *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

produce InFat.  (AC ¶ 30, IPO Prospectus at 77, 80, 86.)  AL, a 50/50 joint venture formed in 2007 by Enzymotec and AAK, then markets and sells InFat to companies that make infant formula.  (AC ¶ 30.)

China is the largest market for infant formula containing InFat.  (AC ¶ 31; IPO Prospectus at 15.)  Specifically, approximately 89% of sales of InFat come in Asia and primarily China.  (AC ¶ 31.)  AL's customers in China consist of non-Chinese manufacturers primarily producing products containing InFat for Chinese infant formula brands, as well as a number of different Chinese manufacturers.  (AC ¶¶ 30-31 & n.6; IPO Prospectus at 76.)  The largest InFat customer is Biostime, a Hong Kong-based brand of premium pediatric nutrition and baby care products.  (AC ¶ 31.)  Sales of InFat attributable to sales in China by and under the brand name of Biostime accounted for between 10% to 12% of the Company's consolidated net revenues in 2012.  (*Id.*)

Enzymotec's other main product is krill oil—which is used in supplements and nutritional products to provide omega-3 fatty acids—and which Enzymotec sells to vitamin and supplement manufacturers and distributors, mainly in the United States and Australia.  (AC ¶ 32; IPO Prospectus at 49, 50, 54.)  Krill are small ocean crustaceans and Enzymotec produces krill oil by sourcing raw krill meal and then extracting oil therefrom.  (AC ¶ 32.)  At the time of the IPO, Enzymotec contracted a manufacturer in India for the extraction, but was in the process of expanding its Migdal Ha'Emaq facility so that it could process krill oil on its own.  (*Id.* ¶ 33.)  On January 13, 2014, Enzymotec announced a completion of the expansion and a successful operating run of the process, which was expected to ultimately lead to improvement in the company's gross margins.  (*Id.*)

Enzymotec's ability to continue and grow InFat sales in China, and in particular through

its sales to Biostime, as well as the Company's continued growth in krill oil sales, were of utmost importance to maintaining Enzymotec's overall financial results. (*Id.* ¶ 35.) Lead Plaintiffs allege that Defendants failed to disclose to investors that Enzymotec's Nutrition segment was on "unstable ground and that the rapid growth recorded prior to and during the first part of the Class Period was unsustainable." (*Id.*) The proposed Class Period is from September 27, 2013 through August 4, 2014 (*id.* ¶ 196), and the Amended Complaint focuses on the Company's initial public offering in September and October of 2013 (IPO), the secondary public offering in February 2014 (SPO), and the ultimate disclosure of information relating to Enzymotec's nutrition segment.

### B. The Public Offerings

In September and October of 2013, the Company held an initial public offering of shares. (*Id.* ¶ 38.) The proceeds were from the IPO were to be used to "meet [the Company's] anticipated increased working capital requirements resulting from the expected growth in the Company's business." (*Id.*) In its IPO Prospectus, Enzymotec emphasized that InFat had been "achieving rapid penetration in the Chinese and other Asian markets," with "significant opportunities in other developing markets," attributing a significant increase in the volume of InFat sales to "increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market" and financial prospects that "outpace[d] . . . industry growth." (*Id.* ¶ 36.) Enzymotec further stated that it had "multi-year contracts with many of [its] customers" and "expect[ed] to continue attracting new customers." (*Id.* ¶ 37.) In the IPO, the Company issued 5,073,800 shares at $14 per share for net proceeds of $63.5 million. (*Id.* ¶ 38.) The shares closed at $18.16 after the first day of trading. (*Id.*) The market responded favorably to Enzymotec's representations concerning its business prospects. (*Id.* ¶¶ 40-41 (citing to analyst reports).)

On November 11, 2013, the Company issued record results for the third quarter of 2013, including a 66.3% increase in net revenues and an 87.5% increase in net income. (*Id.* ¶ 42.) In connection with these results, Defendant Katz stated that Enzymotec's "top line performance was driven by robust performance," including a growth of 68.9% year-over-year in Nutrition. (*Id.*) On the same day, the stock price increased approximately 6.2% to a close of $23.29 and analysts responded favorably. (*Id.* ¶¶ 43-44.)

On December 10, 2013, Defendant Katz emphasized Enzymotec's "very strong existing business growth" and the Company's prospects for future improvements based on its ability to "expan[d] the number of consumers because [of] the unique value proposition that we bring." (*Id.* ¶ 45.) On December 13, 2013, Enzymotec's share price reached a Class-Period high of $33.44. (*Id.*) Analysts continued to write favorably about the Company's prospects. (*Id.* ¶ 46.)

On February 13, 2014, Enzymotec reported positive financial results for the fourth quarter and full year 2013, including 59% and 72% increases in quarterly and annual net revenues, respectively; and 57% and 138% increases in quarterly and annual net income, respectively. (*Id.* ¶ 47.) Commenting on these results, Defendant Katz stated: "For fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance. . . . Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position." (*Id.*) The Company further stated that it "expects net revenues to continue to grow on a sequential basis throughout the year." (*Id.* ¶ 49.) Indeed, Enzymotec issued optimistic guidance for fiscal year 2014, including: "Net revenues, based on the equity method of accounting, of $88 million to $95 million, an increase of 35% to 46%"; "Net revenues, based on the proportionate consolidation method, of $110 million to $120

5

million, an increase of 36% to 49%"; "Non-GAAP net income of $18 million to $22 million, an increase of 31% to 60%"; and "Non-GAAP diluted EPS of $0.77 to $0.94." (*Id.* ¶ 48.) Analysts continued to respond favorably. (*Id.* ¶ 51-52.)

Also on February 13, 2014—approximately five months after the IPO—the Company filed documents with the SEC for the SPO, in which selling shareholders would sell over 5.4 million shares of Enzymotec stock for proceeds of over $150 million. (*Id.* ¶ 50.) Two weeks later, the Company effectuated the SPO at a price of $28 per share (double the IPO price). (*Id.* ¶ 66.) Lead Plaintiffs allege that the selling shareholders included Defendants Katz and Bryan, who personally profited nearly $8 million from their sales, as well as several other senior executives and directors of the Company. (*Id.* ¶ 67.)

### C. The Essence of the Alleged Misrepresentations

Lead Plaintiffs assert that Defendants materially misrepresented Enzymotec's prospects for continued growth during the Class Period (September 2013 to August 2014), claiming that Defendants were "well-aware . . . that Enzymotec was facing formidable hurdles in order to duplicate the astronomical growth in the Company's InFat sales that had fueled its increasing financial results leading up to the IPO and in the first few quarters of Enzymotec's history as a publicly-traded company." (*Id.* ¶ 53.) Specifically, Lead Plaintiffs allege that the Company's insiders "knew that the Chinese infant formula-market was facing a significant change in government regulations that would materially hinder Enzymotec's crucial Chinese InFat sales beginning in 2014" and that the Chinese infant formula market "was saturated and oversupplied, which would also have negative consequences to the Company's bottom line." (*Id.* ¶ 54.)

6

Safety and price-fixing concerns led to increased government oversight of the infant formula industry in China. (*Id.* ¶¶ 55-56.) News of the impending regulations appeared as early as May 2013. (*Id.* ¶ 56.) On August 2, 2013—approximately eight weeks prior to the September 27, 2013 IPO—China announced newly proposed infant formula regulations, allegedly "drafted to increase restrictions on foreign imports and to strengthen domestic markets." (*Id.* ¶ 57.) The proposed legislation was enacted in November and December of 2013. (*Id.*; *see also id.* ¶¶ 58-59 (detailing the specific regulations).) Lead Plaintiffs thus claim that leading up to the IPO and throughout the Class Period, Defendants were "well-aware" that Chinese regulators "were implementing extensive new regulations over the Chinese infant formula market."

> These regulations stood to create significant changes to the infant formula production process in China and would have a dramatic effect on Chinese infant formula sales, which were a centerpiece of Enzymotec's business operations. These regulatory changes posed a significant and foreseeable threat to the profitability of InFat, which represented a significant portion of the Company's revenue.

(*Id.* ¶ 60; *see also* ¶ 61 highlighting Declaration of Dr. Mingruo Guo (Amended Complaint, Ex. A) to show that changes were foreseeable.) Lead Plaintiffs allege that Defendants failed to disclose this "known information" to investors despite their self-professed "regulatory expertise," and "instead forecasted unsustainable growth in the Company's financial results in order to stoke interest in and complete the Offerings." (*Id.* ¶ 62.)

Additionally, Lead Plaintiffs allege that Biostime, the largest purchaser of InFat,[4] had been involved in a price-fixing scandal and operational uncertainty prior to the Class Period which would have also alerted Enzymotec to impending problems. (*Id.* ¶ 63.) A Chinese investigation

---

[4] As noted, sales of InFat attributable to sales in China by and under the brand name of Biostime accounted for between 10% to 12% of the Company's consolidated net revenues in 2012. (AC ¶ 31.)

into Biostime's pricing practices began in March 2013, and in August 2013, Biostime was fined 162.9 million yuan, equivalent to six percent of its 2012 sales, which negatively affected Biostime's long-term prospects. (*Id.* ¶¶ 63-65.) Furthermore, Lead Plaintiffs allege that these issues were compacted by the fact that Biostime "had built up its inventory to approximately double year-over-year with sales increasing 38%, which would have caused concern for the Company's ability to reach its growth targets for the first half of 2014." (*Id.* ¶ 65.) Thus, Lead Plaintiffs allege that "[d]espite knowledge of the operational issues plaguing one of Enzymotec's most important customers, the Exchange Act Defendants materially misled investors concerning the impact of these issues on the Company's business." (*Id.* ¶ 65.)

### D. Disclosure to the Markets

On May 14, 2014, Enzymotec announced positive financial results for the first quarter of 2014: net revenues increased 29.1% to $17.9 million under the equity method, and 43.5% to $23.7 million under the proportionate consolidation method; net income increased 118.0% to $5.1 million; non-GAAP net income increased 135.3% to $5.6 million; adjusted EBITDA increased 119.3% to $6.5 million; and quarterly operating cash flow of $4.8 million. (*Id.* ¶ 68.)

Also on May 14, 2014, however, Defendants disclosed that the Company's Chinese operations may experience problems due to changes in Chinese regulations over infant formula manufacturing. (*Id.* ¶ 69.) In particular, the Company stated as follows:

> The Company expects second quarter net revenues and earnings to be equal to or lower than the second quarter of 2013. As the Company previously disclosed, in the second quarter it plans to install new equipment to increase its manufacturing capacity, which will require a temporary shutdown of the plant. Additionally, recent changes in Chinese regulations require infant formula manufacturers to make certain changes to their production chain. As a result, changes may be required to supply arrangements in

8

response to customer requests. The Company does not expect this
change in Chinese regulations to impact its 2014 revenues, but it
does expect that this will result in revenues being shifted from the
second quarter to the second half of the year.

(*Id.*)  As a result, Enzymotec updated its guidance for fiscal year 2014—which it had previously

issued on the same day it announced the SPO. (*Id.* ¶ 70.)  The updated guidance included: "Net

revenues, based on the equity method of accounting, of $68 million to $85 million, an increase of

5% to 31% over fiscal year 2013; Net revenues, based on the proportionate consolidation method,

of $90 million to $110 million, an increase of 12% to 36% over fiscal year 2013; Non-GAAP net

income of $15 million to $22 million, an increase of 9% to 60% over fiscal year 2013; and Non-

GAAP diluted EPS of $0.64 to $0.94." (*Id.*)  Commenting on the financial results and updated

guidance, Defendant Katz stated that the Company believed "these headwinds will mainly impact

us in the second quarter" and that it "remain[ed] optimistic in our outlook for second half of the

year due to improved supply/demand dynamics across our business segments" and "believe[d]

Enzymotec is well positioned for future growth in revenues in profit . . . ." (*Id.* ¶ 71.)  The

Company's share price dropped $6.48 per share on May 14, 2014 to close at $13.75 per share, a

one-day decline of over 32% on heavy trading volume. (*Id.* ¶ 72.)  Analysts incorporated these

statements into their own guidance. (*Id.* ¶ 73.)

On August 5, 2014, Enzymotec announced negative financial results for the second quarter

of 2014: net revenues decreased 39.5% to $9.0 million under the equity method, and 34.4% to

$11.5 million under the proportionate consolidation method; second quarter net income decreased

to $0.4 million, and EBITDA decreased to $1.2 million. (*Id.* ¶ 77.)  In connection with the results,

the press release stated as follows:

In the second quarter our business experienced operational

challenges based on external market dynamics which hindered our financial performance," stated Dr. Ariel Katz, Enzymotec's President and Chief Executive Officer. "While we expected these headwinds in the quarter, particularly related to recent regulatory changes in the Chinese infant formula market and weakness in the U.S. and Australian Omega-3 industry, their overall impact was greater than anticipated and will continue to adversely impact Enzymotec for at least the next two quarters."

(*Id.* ¶ 78.) Enzymotec also decreased guidance again for 2014 as follows: "Net revenues, based on the equity method of accounting, of $46 million to $52 million; Net revenues, based on the proportionate consolidation method, of $62 million to $70 million; Non-GAAP net income of $8 million to $10 million; and Non-GAAP diluted EPS of $0.34 to $0.43." (*Id.* ¶ 79.) Thus, as stated by Lead Plaintiffs, "in just five months after successfully completing the SPO in which Enzymotec insiders sold approximately $54.3 million of their personal Company stock, Enzymotec slashed its net revenue guidance in its key financial metrics by as much as 55%." (*Id.*) Analysts once again incorporated this information into their guidance. (*Id.* ¶¶ 80-81.) The Company's stock price declined $5.85 per share on August 5, 2014 to close at $9.11 or nearly 40%, on heavy trading volume, representing a 72% decrease from its Class Period high of $33.44. (*Id.* ¶ 82.)

## **PROCEDURAL BACKGROUND**

This action was commenced on September 5, 2014. (ECF No. 1.) By Order dated February 11, 2015 and Supplemental Letter Opinion & Order dated March 3, 2015, United States District Judge Madeline C. Arleo appointed the Enzymotec Investor Group as Co-Lead Plaintiffs, approved their selection of counsel, and consolidated the related actions. (ECF Nos. 20, 24.)

In accordance with a scheduling stipulation and Order (ECF No. 29): Lead Plaintiffs filed the Amended Complaint on May 18, 2015 (ECF No. 33); Defendants filed the instant motion to

dismiss on July 17, 2015 (*see* ECF No. 36-3 ("Mov. Br.")); Lead Plaintiffs filed opposition on September 15, 2015 (ECF No. 38 ("Opp. Br.")); and Defendants replied on October 30, 2015 (ECF No. 43 ("Reply Br.")).

Separately, on July 23, 2015, this action was transferred to the undersigned.  (ECF No. 37.) The motion is now ripe for resolution.

## LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.  *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).  "In deciding a Rule 12(b)(6) motion, a court must consider only

11

the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

The Court's role is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). The Court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## ANALYSIS

### A. Section 10(b) and Rule 10b–5 of the Securities Exchange Act[5]

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Securities and Exchange Commission, makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

---

[5] The § 10(b) and Rule 10b–5 claims are asserted against Enzymotec and the Officer Defendants. (AC ¶¶ 124-32.)

12

17 C.F.R. § 240.10b–5.

To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege that defendants: "[1] made a misstatement or an omission of material fact [2] with scienter [3] in connection with the purchase or the sale of a security [4] upon which plaintiff reasonably relied and [5] plaintiff's reliance was the proximate cause of their injury." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009) (quoting *Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)). Furthermore, "[a] corporation is liable for statements by employees who have apparent authority to make them." *Id.* (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 708 (7th Cir. 2008)).

Additionally, Lead Plaintiffs must meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014). Rule 9(b) provides, in relevant part, as follows: "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, at a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of a newspaper story'-that is, the 'who, what, when, where and how' of the events at issue." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004) (citation omitted).

Similarly, as per the PSLRA, a plaintiff must satisfy heightened pleading requirements and "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 321 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 194, and n.12 (1976), and citing 15 U.S.C. § 78u–4(b)(1), (2)).  First, with regard to misleading statements and omissions of material fact, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, the statement must have been misleading at the time it was made, as "liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).  Additionally, "when assessing the sufficiency of allegations made on information and belief pursuant to 15 U.S.C. § 78u–4(b)(1)," "plaintiffs need only plead with particularity *sufficient* facts to support those beliefs." *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) (adopting *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)).  In other words, the facts alleged must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.*

As to the second requirement of scienter—the intent to deceive, manipulate, or defraud investors—"each act or omission alleged to violate [Section 10(b)], [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u4(b)(2).[6]  In evaluating whether a complaint meets this requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.  A "strong" inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference

---

[6] To the extent that the PSLRA's scienter pleading requirements conflict with those of Federal Rule of Civil Procedure 9(b), the PSLRA supersedes the latter as it relates to Rule 10b–5 actions. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir.2009); *see also Alpharma*, 372 F.3d at 148.

of nonfraudulent intent. . . . The inference . . . need not be refutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 314, 324. The Third Circuit permits a plaintiff to satisfy this requirement with allegations of strong circumstantial evidence of either conscious behavior or recklessness. *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000); *see also In re Radian Sec. Litig.*, 612 F.Supp.2d 594, 607 (E.D. Pa. 2009) (noting that although in *Tellabs* the Supreme Court specifically reserved the question of whether recklessness could give rise to civil liability under 10b–5, "every court of appeals to consider the issue has held that a plaintiff can meet the scienter requirement by showing that a defendant acted intentionally or recklessly.") In this context, recklessness is "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *S.E.C. v. Infinity Grp. Co.*, 212 F.3d at 192. Finally, a court considers the entirety of a complaint in determining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." *Tellabs I*, 551 U.S. at 322; *see also Avaya*, 564 F.3d at 273.

Aside from the two requirements pertaining to the facts surrounding the alleged violation and scienter, the PSLRA imposes additional burdens with respect to allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u-5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show

the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254.[7]

However, a "'mixed present/future statement is not entitled to the safe harbor with respect to the

part of the statement that refers to the present.'" *Id.* at 255 (quoting *Tellabs II*, 513 F.3d at 705).

If the statement is forward looking, cautionary language must be extensive yet specific and touch

upon the subject matter of the alleged misrepresentation in order for the safe harbor to apply. *See*

*Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) ("[A] vague or blanket (boilerplate)

disclaimer which merely warns the reader that the investment has risks will ordinarily be

inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive

and tailored to the specific future projections, estimates or opinions in the prospectus which the

plaintiffs challenge.") (quoting *In re Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir.1993));

*see also Avaya, Inc.*, 564 F.3d at 256 (3d Cir. 2009) (reiterating same).  Thus, boilerplate language

that merely warns readers of the risks associated with investing is generally insufficient.  *Id.*

Cautionary language in SEC filings "may be incorporated by reference" into the document

containing the forward-looking statement, and need not be contained within the same document as

the forward-looking statement itself.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010)

(quoting *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005)).

     Defendants generally do not dispute that the following elements of the cause of action are

properly pleaded: materiality, reliance, loss causation,[8] and damages.  Falsity and scienter are

---

[7] The Court also notes that the "bespeaks caution" doctrine is relevant to interpreting the PSLRA safe harbor. *Avaya*, 564 F.3d at 254-56; *see also In re Anadigics, Inc., Sec. Litig.*, Civil Action No. 08-5572, 2011 WL 4594845, at *10 n.4 (D.N.J. Sept. 30, 2011) (noting that the Third Circuit Court of Appeals has "incorporated much of the [bespeaks caution] doctrine into its analysis of the PSLRA") (citing *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 533-34 (D.N.J. 2010))).

[8] Defendants do argue that Lead Plaintiffs have failed to allege loss causation with respect to their krill oil claims. (*See* Mov. Br. at 14 n.11 ("Plaintiffs assert that Enzymotec's stock price fell in response to press releases and conference calls on May 14, 2014 and August 14, 2014. Neither of those announcements revealed any "true facts" that had not already been disclosed concerning the high concentration of Enzymotec's sales of krill oil to a single

heavily disputed.  The Court analyzes falsity and scienter below.

      1. Falsity

      In the Amended Complaint, Lead Plaintiffs allege that "[i]n regular press releases, conference calls, and filings with the SEC, Enzymotec and the Officer Defendants regularly made false and misleading statements and material omissions during the Class Period" (AC ¶ 83), concerning Enzymotec's financial guidance (*id.* ¶¶ 84-92), Enzymotec's sales of InFat in China (*id.* ¶¶ 93-102), Chinese regulations (*id.* ¶¶ 103-09), and internal controls (*id.* ¶¶ 110-13).  Each category is discussed more fully below.

      For all of these above categories of statements, Lead Plaintiffs contend that the Exchange Act Defendants made these statements "in contrast to Enzymotec's 'regulatory expertise'" and that that these statements were materially false and misleading since

> Defendants knew, or were reckless in disregarding, significant information and red flags prevalent as early as May 2013—prior to the start of the Class Period—that the Chinese regulatory landscape concerning the infant formula market was about to undergo a seismic shift that would have a significantly negative effect on the Company's important InFat sales in China—a core area of Enzymotec's operations.

(*Id.* ¶¶ 90, 100, 107, 111.)   Lead Plaintiffs allege that Defendants "knowingly or recklessly disregarded the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues relating to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales." (*Id.* ¶¶ 91, 101, 108, 112).  Additionally, for the statements concerning Enzymotec's financial guidance (*id.* ¶¶ 84-92),

---

customer.").)  Lead Plaintiffs counter that loss causation is a fact intensive inquiry beyond the scope of a 12(b)(6) motion. (Opp. Br. at 11 n.9.)  Because the Court grants the motion to dismiss with respect to the krill oil claims due to application of the safe harbor, *see* Part A.1.a, *infra*, the Court need not address this argument.

and internal controls (*id.* ¶¶ 110-13), Lead Plaintiffs allege that the Company

> knowingly or recklessly failed to account for the fact that a large
> percentage of Enzymotec's growth in krill sales from 2012 to 2013
> leading up to the IPO were obtained on the strength of additional
> sales to a single customer who placed initial orders with the
> Company in 2012 and significantly increased those orders in 2013,
> thus rendering the Company dependent on these sales to maintain
> the business and growth projections provided to investors in order
> to stoke interest in the SPO.

(*Id.* ¶¶ 91, 112.)

Defendants first argue that Enzymotec's guidance, forecasts, and predictions are protected

by the "safe harbor" for forward-looking statements.  (Def. Mov. Br. at 11-14; Def. Reply Br. at

2-3.) Next, they contend that Enzymotec made no false or misleading statements about InFat sales,

since they were accurate statements of historical fact or puffery or otherwise not actionable.  (Def.

Mov. Br. at 14-16; Def. Reply Br. at 3-4.)  Additionally, Defendants claim that Enzymotec had no

duty to disclose Chinese regulations not directed at it or specifics about its sales contracts.  (Def.

Mov. Br. at 16-20; Def. Reply Br. at 4-6.)  Finally, Defendants argue that the market had complete

information concerning the changes in the Chinese regulations of infant formula manufacturers.

(Def. Mov. Br. at 20-21; Def. Reply Br. at 6-7.)

In response, Lead Plaintiffs argue that the "safe harbor" is inapplicable because many of

Defendants' statements were statement of present fact (in that the risks they were warning of had

already come to pass), and that even if they were forward-looking they were not accompanied by

meaningful cautionary language.  (Pl. Opp. Br. at 8-12.)  Next, Lead Plaintiffs contend that the

statements are not mere puffery because they go to the heart of Enzymotec's financial stability,

and in any event raise fact questions not to be determined at the pleadings state.  (*Id.* at 12-14.)

Additionally, Lead Plaintiffs argue that Defendants' statements were false and misleading at the

18

time that they were issued. (*Id.* at 14-19.) Finally, Lead Plaintiffs contend that the Defendants omitted material information where there was a duty to disclose and that the truth on the market defense is without merit. (*Id.* at 19-21.) The Court addresses each argument in turn.

> a. *The Court Cannot Conclude at This Stage That the Safe Harbor Applies to Enzymotec's Guidance, Forecasts, and Predictions because of Specific Allegations that Cautionary Language Was Not Meaningful.*

With respect to Enzymotec's guidance, Lead Plaintiffs allege that in the February 13, 2014 press release announcing financial results for the quarter and fiscal year ending December 31, 2013, Defendant Katz stated: "[f]or fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance. . . . Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position." (AC ¶ 85.) The February 13, 2014 press release further stated: "The Company expects net revenues to continue to grow on a sequential basis throughout the year." (*Id.* ¶ 86.) In the Company's May 10, 2014 Q1 2014 press release, Defendant Katz cautioned that "headwinds" would impact the Company in the second quarter, but stated that "[n]otwithstanding our outlook for the second quarter, I believe Enzymotec is well positioned for future growth in revenues and profit as we continue to expand our customer base . . . ." (*Id.* ¶ 87.) Addressing the change in Chinese regulations, the guidance for 2014 contained in a May 14, 2014 press release stated that "[t]he Company does not expect this change in Chinese regulations to impact its 2014 revenues, but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year" and on a conference call the same day Defendant Katz reiterated that "[t]he changes in Chinese regulation should not [] impact our 2014 revenues, but we do expect that this will result in revenues being shifted from the second quarter to the second half of the year." (*Id.*

19

¶¶ 88, 89.)

Defendants argue that the statements Lead Plaintiffs challenge concerning Enzymotec's guidance (*id.* ¶¶ 84-92) "are quintessential forward-looking statements" that were "accompanied by meaningful cautionary language that mirrors Plaintiffs' allegations regarding Enzymotec's missed projections." (Mov. Br. at 12.) In other words, Defendants contend that Enzymotec provided its stockholders with adequate and meaningful risk disclosures warning them of the exact issues that Plaintiffs claim prevented Enzymotec from meeting its forecasts and reaching its goals. (Mov. Br. at 11-14; Reply Br. at 2-3.) Specifically, Defendants point out that Enzymotec's public filings warned that the Company's "international operations and sales are subject to a number of risks, including: . . . regulatory limitations imposed by foreign governments and unexpected changes in regulatory requirements, tariffs, customs, duties, tax laws, and other trade barriers." (Mov. Br. at 12 (citing IPO Prospectus at 22; Zelichov Decl., Ex. C ("Annual Report") at 13; Zelichov Decl., Ex. D ("SPO Prospectus") at 2).) Defendants further note that Enzymotec also stated that it is "subject to significant and increasing government regulations regarding the sale and marketing of [its] products," that "regulatory authorities may change processes, regulations, and policies related to our products," and identified the Ministry of Health in China as one of the regulatory bodies to which Enzymotec and its products are subject. (*Id.* at 12-13 (citing IPO Prospectus at 24; Annual Report at 15; SPO Prospectus at 25).) Additionally, Defendants note that Enzymotec even disclosed that "Chinese authorities have recently launched investigations and levied fines related to alleged price fixing by infant nutrition companies including Biostime and may do so in the future." (*Id.* at 13 (citing IPO Prospectus at 15; Annual Report at 5; SPO Prospectus at 13).)

Furthermore, with respect to the krill oil business, Defendants point out that Enzymotec's Annual Report, filed on the same day as its February 13, 2014 press release, specifically disclosed that "[w]e are subject to a degree of customer concentration and our customers do not enter into long-term purchase commitments with us" and that:

> Our remaining significant customers in 2013 include one North American purchaser of krill products that accounted for 15% of our revenues in that year up from less than 2% in 2012.

(*Id.* at 13 (citing Annual Report at 6; SPO Prospectus at 14; Zelichov Decl., Ex. G ("Feb. 13, 2014 6-K") at 7 ("[W]e are subject to a degree of customer concentration"); Zelichov Decl., Ex. I ("May 14, 2014 6-K") at 5 (same).)   Defendants note that the Company also disclosed that "[a]pproximately $9.2 million of the increase in sales of krill oil products was from one customer." (*Id.* (citing Annual Report at 51, F-18; SPO Prospectus at 14, 53).)

Finally, Defendants argue that the Amended Complaint "lacks particularized allegations that any of the Defendants had actual knowledge that their statements were false or misleading when made" such that the third prong of the safe harbor does not apply. (Reply Br. at 3 n.3.)

Lead Plaintiffs counter that the safe harbor is inapplicable because the statements concerning Enzymotec's financial guidance were either statements of present or historical fact, and that even if they were forward-looking, the cautionary language is insufficient because the risks Defendants were warning of had already come to pass. (Opp. Br. at 9-12.) First, Plaintiffs argue that the statements "concerned Enzymotec's present business and operational state that were materially false and misleading at the time they were made given the prevalent changes in China's regulatory environment, which changes would have a materially adverse effect on the Company's financial condition." (*Id.* at 9-10 (citing AC ¶¶ 86-87, 93, 94, 99).)

Second, Lead Plaintiffs argue that even if the statements can be considered forward looking, the safe harbor still does not apply because the cautionary language was "nothing but legally ineffective boilerplate" and that determining whether cautionary language is sufficiently "meaningful" raises fact issues that are improperly resolved on a motion to dismiss. (*Id.* at 9 n.6, 10.) In particular, Lead Plaintiffs argue that disclosure that a company is "subject" to "government regulations" is applicable to "*any* company in *any* industry," and that the language does not warn investors of the specific risks that the changes in the Chinese regulations would have on the Company's business. (*Id.*) Similarly, Lead Plaintiffs contend that the disclosures regarding krill oil sales "do not warn of the specific risks actually experienced at the time, which is particularly ineffective given the Company's contemporaneous assurances that its customer relationships provided 'good visibility' in sales." (*Id.* at 11.) Alternatively, Lead Plaintiffs argue that the statements are not entitled to safe harbor because they were made with knowledge of their falsity. (*Id.* at 11 (citing AC ¶¶ 85-89, 93-94, 99); *id.* at 15-16.)

The Court finds that Lead Plaintiffs have set forth sufficient allegations of materially false and misleading statements with respect to guidance, forecasts, and predictions to survive the Motion to Dismiss with respect to InFat. First, the Court finds that at least part of the statements relating to Enzymotec's guidance could be deemed by a fact finder to be statements of present or historical fact, and as such are not entitled to PSLRA's safe harbor at this stage. For example, statements relating to Enzymotec being "well positioned for future growth" (AC ¶ 87), or relating to InFat "achieving rapid penetration" or "increased market penetration" (*id.* ¶¶ 93, 94) relate to then-existing conditions as opposed to future projections. These statements, even if made within the context of truly forward-looking statements, are not entitled to the safe harbor. *See Avaya*, 564

F.3d at 255 ("'[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'") (quoting *Tellabs II*, 513 F.3d at 705).

Second, to the extent that the alleged misrepresentations by Defendant were forward-looking, the Court finds that Lead Plaintiffs have specifically alleged that the statements were not accompanied by meaningful cautionary language to entitle safe harbor protection at this stage.  For example, even though Defendants warned generally of "significant and increasing government regulations" and specifically identified the Ministry of Health in China in their SPO Prospectus, Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect.  (*See* AC ¶¶ 90, 91.)  The Court finds that at this early stage of the litigation, Lead Plaintiffs have alleged with adequate particularity that any forward-looking statements made by Defendants regarding InFat were not accompanied by sufficient cautionary language.  *See Semerenko*, 223 F.3d at 182 (nothing that a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation" and that "the cautionary statements must be substantive and tailored" to suffice); *see also City of Hialeah Employees' Ret. Sys. & Laborers Pension Trust Funds for N. California v. Toll Bros.*, No. 07-1513, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) ("Plaintiffs have specifically pled that there existed several material adverse facts at the time the future projections were made that suggest that these projections were unreasonable at the time they were made.").

However, the Court agrees with Defendants that Lead Plaintiffs have not stated a claim with respect to statements concerning krill oil.  Specifically, the Court finds Defendants have

demonstrated that they are entitled to safe harbor protection for statements relating to krill oil and that Lead Plaintiffs have not demonstrated how the cautionary language regarding the krill oil segment was insufficient. Enzymotec's Annual Report, filed on the same day as its February 13, 2014 press release, specifically disclosed that "[w]e are subject to a degree of customer concentration and our customers do not enter into long-term purchase commitments with us" and that:

> Our remaining significant customers in 2013 include one North American purchaser of krill products that accounted for 15% of our revenues in that year up from less than 2% in 2012.

(Annual Report at 6; SPO Prospectus at 14; Feb. 13, 2014 6-K at 7 ("[W]e are subject to a degree of customer concentration"); May 14, 2014 6-K at 5 (same).) Further, the Company also disclosed that "[a]pproximately $9.2 million of the increase in sales of krill oil products was from one customer." (Annual Report at 51, F-18; SPO Prospectus at 14, 53).) Lead Plaintiffs allegations that Defendants provided only generalized warnings with respect to krill oil sales (Opp. Br. at 11 (citing to statement regarding "good visibility" in sales)) are thus directly contradicted by these specific disclosures. *See St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. 04-4540, 2005 WL 1199045, at *3 (D.N.J. May 18, 2005) ("To the extent that Plaintiff's allegations are contradicted by the documents attached to the Complaint upon which its claims are based, the Court need not accept such allegations as true.") (citing *Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*, 27 Fed. Appx. 94, 99-100 (3d Cir. 2002)).

Accordingly, the Court will grant the motion to dismiss with respect to claims concerning krill oil sales but will deny the motion to dismiss with respect to claims concerning InFat. Because the Amended Complaint makes specific allegations with adequate particularity about the alleged

24

inapplicability of the safe harbor relating to InFat, the Court finds that that Lead Plaintiffs are

"entitled to offer evidence to support the claims." *Wilkins*, 659 F.3d at 302 (3d Cir. 2011).

> b. *Statements Concerning InFat Sales are Mixed Questions of Law and Fact Not Appropriate for Resolution at This Stage*

With respect to sales of InFat in China, in the IPO Offering Documents, the Company

stated that "InFat has been achieving rapid penetration in the Chinese and other Asian markets"

and further touted "increased market penetration due to growing awareness of the benefits of InFat,

especially in the Chinese market." (AC ¶ 93.) And in the July 10, 2013 Form DRS Draft

Registration Statement, the Company emphasized that it had

> multi-year contracts with many of our customers and are embedded within their product development cycles, resulting in high switching costs for them and providing us with good visibility on sales. . . . Furthermore, we expect to continue attracting new customers as the strong brand recognition of our existing key customers, such as Biostime and IVC in our Nutrition segment, builds consumer awareness of our premium products. Sales of our infant formula products are currently strongest in China. . . . We expect net revenues to increase as additional infant nutrition brands choose to use InFat.

(*Id.* ¶ 94.) Similarly, on a November 11, 2013 conference call, Defendant Katz reiterated that

"InFat has been achieving rapid penetration in Chinese and other Asian markets . . . ." (*Id.* ¶ 95.)

And on a February 13, 2014 conference call, Defendant Bryan stated that "[w]e see continuous

growth and interest [in InFat] . . . [and] feel on track with what we have spoken in the – when we

went to the IPO and we see a good acceptance of the products continue" and Defendant Katz stated

"[r]egarding the contracts that we have in our – with our customers, we feel confident, we're

striving all the time to bring more value and it seems that is very stable contracts." (*Id.* ¶¶ 96-97.)

In the Company's 2013 Form 20-F, the Company highlighted "increased market penetration due

to growing awareness of the benefits of InFat, especially in the Chinese market." (*Id.* ¶ 98.) Further, on the May 14, 2014 conference call, Defendant Katz stated that the InFat "joint venture with AAK has also been achieving rapid penetration in Chinese and other Asian market(s) . . . ." (*Id.* ¶ 99.)

Defendants argue that the statements concerning InFat sales (*id.* ¶¶ 93-100) are not actionable for three reasons. First, Defendants claim that the statements are accurate statements about Enzymotec's historical and present financial performance. For example, Enzymotec had been achieving "rapid" or "increased" penetration in China—"its sales in Asia increased 45% in the first six months of 2013, 400% for the whole year, and Enzymotec had sales growth in line with its February 2014 projection in the first quarter of 2014 as well." (Mov. Br. at 15 (citing IPO Prospectus at 50; Annual Report at 47; May 14, 2014 6-K).) Defendants argue that "the fact that InFat sales did not continue to grow in the second quarter of 2014 does not render any of these statements false when made and simply constitutes an effort to plead fraud by hindsight." (Mov. Br. at 15.)

Second, to the extent that the statements are not deemed accurate statements about Enzymotec's historical and present financial performance, Defendants assert that "most of Enzymotec's statements are puffery and cannot, as a matter of law, support a claim for securities fraud." (*Id.*) Defendants contend that statements such as "rapid penetration,"[9] "strong brand recognition,"[10] "continuous growth and interest,"[11] "on track,"[12] "good acceptance,"[13]

---

[9] AC ¶¶ 93, 95, 99.
[10] *Id.* ¶ 94.
[11] *Id.* ¶ 96.
[12] *Id.*
[13] *Id.*

26

"confident,"[14] and "very stable,"[15] are "simply 'vague expressions of hope' that 'have been almost uniformly rejected by the courts' as the basis for a claim under the securities laws." (Mov. Br. at 15 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997).)

Third, Defendants argue that statements that the Company "expect[s] to continue attracting new customers" and "expect[s] net revenues to increase"[16] are entitled to safe harbor protection since they are forward-looking and accompanied by meaningful cautionary language. (Mov. Br. at 15-16.)

Lead Plaintiffs counter that the statements concerning the viability of InFat sales and the strength of Enzymotec's contractual relations cannot be considered inactionable puffery at this stage. (Opp. Br. at 12-14.) As an initial matter, Lead Plaintiffs contend that puffery determinations are a mixed question of law and fact that should ultimately be left to the trier of fact, since a statement is considered puffery only when it is immaterial, such that a "reasonable investor would not rely on it in considering the 'total mix' of [available] information." (*Id.* at 12 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200-01 (3d Cir. 1990).) Lead Plaintiffs thus argue that the statements regarding InFat sales were material to investors because they "go to the heart of Enzymotec's financial stability and were made against the backdrop of a general decline in the infant formula industry." (*Id.* at 12.) Additionally, they argue that statements alluding to "good visibility" resulting from the Company's customer relationships "conveyed to investors stability in Enzymotec's customer relationships and a sound basis upon which their assurances concerning continued growth were

---

[14] AC ¶ 97
[15] AC ¶ 97
[16] AC ¶¶ 93-94, 99.

27

evaluated." (*Id.* at 13.) Further, Lead Plaintiffs contend that they have sufficiently alleged specific facts concerning Defendants' knowledge of the falsity of their statements at the time they were made. (*Id.* at 13-18.)

Ultimately, Lead Plaintiffs assert that they "do not seek to hold Defendants accountable for failing to predict regulatory changes. Rather, the Amended Complaint's allegations are based on Defendants' misrepresentations and omissions about Enzymotec's practices and the then-existing developments in Chinese regulations, both of which were critical to Enzymotec's bottom line and to investors." (*Id.* at 14.) In essence, Lead Plaintiffs contend that "although Defendants knew (or should have known) of the looming decrease in InFat sales, they deliberately withheld this information until after completing the SPO, while incredibly claiming that the Company's growth was sustainable" (*id.* at 17 (citing AC ¶¶ 53-67)) and that Defendants "either knew of and ignored the effects on Enzymotec's business that the regulatory changes presented, or were deliberately reckless in not knowing about them, in order to effectuate the SPO." (*Id.* at 18.)

As an initial matter, for the reasons stated in Part A.1.a, *supra*, the Court finds that the statements regarding InFat sales are not entitled to safe harbor protection at this stage, since Lead Plaintiffs have specifically alleged that the accompanying cautionary language is inadequate. Additionally, the Court finds that when viewing the Amended Complaint in its entirety, it cannot conclude that all of the statements regarding InFat sales are accurate statements about Enzymotec's historical and present financial performance. Lead Plaintiffs' specifically allege that "Defendants knowingly or recklessly disregarded the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues related to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales"

28

and that "Defendants provided a materially false and misleading depiction of the Company's InFat sales in the Chinese market during the Class Period[.]"  (AC ¶¶ 101, 102.)  When taking such allegations into consideration and viewing them in a light most favorable to Lead Plaintiffs, the Court finds that the statements regarding InFat sales—such as "see[ing] continuous growth and interest," "good acceptance of the products continue," and "very stable contracts" (AC ¶¶ 96, 97)— can plausibly give rise to liability, such that Lead Plaintiffs are "entitled to offer evidence to support the claims." *Wilkins*, 659 F.3d at 302 (3d Cir. 2011).  Indeed, although the Court acknowledges and appreciates Defendants' framing of the case as merely one of "fraud-by-hindsight," this particularized analysis "is not something that the Court is tasked with tackling at this stage, given the inferences owed to the Plaintiff." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 470 n.20 (E.D. Pa. 2014).

Furthermore, the Court cannot conclude at this stage of the litigation that the statements regarding InFat sales are inactionable puffery.  Puffery is "vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied." *Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-00993, 2015 WL 3833849, at *16 (M.D. Pa. June 22, 2015) (citing *In re Advanta*, 180 F.3d 525 (3d Cir. 1999)); *see also In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (noting that puffery includes "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism.").  In other words, a statement is considered puffery only when it is immaterial. "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 (3d Cir. 1992) (citing *TSC Indus., Inc. v. Northway,*

*Inc.*, 426 U.S. 438, 450 (1976)).   Indeed, "the emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997). Although Defendants' argument that the statements concerning InFat sales amount to nothing more than puffery are well-taken, when viewing the Amended Complaint as a whole and in a light most favorable to Lead Plaintiffs as the Court must, the Court concludes that the allegations here sufficiently raise a mixed question of law and fact to allow the claims to proceed.   "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro*, 964 F.2d at 280 (citing *TSC*, 426 U.S. at 450).   Given the inferences owed to Lead Plaintiffs, the Court concludes at this stage of the litigation that reasonable minds could differ on the question of materiality with respect to the statements regarding InFat sales.

c. *Giving All Inferences to Lead Plaintiffs, Defendants Had a Duty to Disclose Chinese Regulations*

With respect to Chinese regulations, Lead Plaintiffs allege that in the Company's May 14, 2014 press release, the company acknowledged the "recent changes in Chinese regulations" but stated that "[t]he Company does not expect this change in Chinese regulations to impact its 2014 revenues, but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year." (AC ¶ 104.)  This statement was reiterated when Defendant Bryan stated during the May 14, 2014 earnings call that "[w]e believe [the recent changes in Chinese regulation] will result in revenues being shifted form the second quarter to the second half of the year."  (*Id.* ¶ 105.)  During the June 5, 2014 Jefferies 2014 Global Healthcare Conference, Lead Plaintiffs allege that Defendant Katz stated that the regulatory change "doesn't impact our not

expect [sic] to have impacting [sic] 2014" and reiterated that the Company "will see slowdown during quarter two and expect that (inaudible) catch-up in quarter three and quarter four." (*Id.* ¶ 106.)

Defendants argue that they had no obligation to disclose the details of the new Chinese regulations every time it "accurately described" sales of InFat in China because the securities laws do not require companies to disclose general industry-wide trends. (Mov. Br. at 16.) Defendants contend that since the regulations did not become effective until May 2014, "they have no bearing whatsoever on Enzymotec's statements through May 2014, rendering the vast majority of the [Amended Complaint] entirely irrelevant." (*Id.* at 17.) Additionally, Defendants stress that InFat was not immediately implicated by the regulatory changes—instead, the changes were to regulations of infant formula manufacturers, which Enzymotec does not manufacture. (*Id.* at 17-18.) Similarly, Defendants argue that statements about "good visibility" on sales do not require disclosure of every possible factor potentially affecting sales, especially because "good visibility" is puffery and Lead Plaintiffs have not explained how the statements make any of the statements about past results false or misleading. (*Id.* at 18-19.) Specifically, Defendants point out that Enzymotec's last indication that it had "good visibility on sales" was in the prospectus for the SPO in February 2014, and that thereafter, Enzymotec reported good results in May 2014, putting it on track to meet its February guidance. (*Id.* at 19.) Defendants thus argue that Lead Plaintiffs "cannot claim that any of Enzymotec's statements about 'good visibility' were false or misleading because Enzymotec met its projections even after the last time it made that statement." (*Id.*)

Lead Plaintiffs contend that Defendants "routinely and publicly highlighted the Company's viability of its InFat business—which drove Enzymotec's continuous growth—thus triggering a

31

duty to disclose and correct any 'inaccurate or misleading prior disclosure.'" (Opp. Br. at 20 (citing *In re Urban Outfitters, Inc. Sec. Litig.*, 2015 WL 2069222, at *10 (E.D. Pa. May 4, 2015)).) Lead Plaintiffs argue that at the very least, Defendants' arguments raise a fact question. (*Id.* at 20.)

"[N]on-disclosure of material information will not give rise to liability under Rule 10b–5 unless the defendant had an affirmative duty to disclose that information." *See Oran v. Stafford*, 226 F.3d 275, 78-86 (3d Cir. 2000). "Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011) (quoting Rule 10b–5 and *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988)); *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000) ("[A] duty to disclose may arise when there is . . . an inaccurate, incomplete or misleading prior disclosure.").

Here, the Court finds that, when giving all inferences in favor of Lead Plaintiffs, Defendants had a duty to disclose the specifics of the Chinese regulations. As an initial matter, the Court agrees that the question of whether disclosure was required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact. *See Weiner*, 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings."). Furthermore, Lead Plaintiffs specifically allege a duty to disclose. For example, although Defendants warned generally of "significant and increasing government regulations" and specifically identified the Ministry of Health in China in their SPO Prospectus, Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable

32

to make generalized warnings when Defendants knew, or should have known, of the specific

regulations and their likely effect. (*See* AC ¶¶ 107-09.) Accordingly, the Court finds that, at this

early stage of the litigation, the Amended Complaint adequately alleges that Defendants had a duty

to disclose.

> ### d. Whether There Was Complete Information in the Market Concerning the Changes in the Chinese Regulations of Infant Formula Manufacturers Should Not Be Determined at This Early Stage

Defendants argue that all of the alleged misstatements and omissions are immaterial given

the "total mix" of information available to investors. (Mov. Br. at 20-21.) Specifically, Defendants

contend that because the new Chinese regulations were publicly known—as evidenced by news

articles, government reports, and analyst reports subject to judicial notice—Plaintiffs cannot show

a misstatement or an omission of material fact. (*Id.*)

Lead Plaintiffs counter that Defendants "repeatedly and directly obfuscated the impact" of

the Chinese regulations, such that a reasonable investor could not have ascertained the effect of

the changes. (Opp. Br. at 20-21.) Additionally, Lead Plaintiffs argue that, to prevail on this theory,

Defendants would have to show that the market understood the regulations' implications, which

is a fact question not properly addressed at this stage. (*Id.* at 21.)

"The 'truth on the market' defense recognizes that a statement or omission is materially

misleading only if the allegedly undisclosed facts have not already entered the market." *The Winer*

*Family Tr. v. Queen*, No. 03-4318, 2004 WL 2203709, at *4 (E.D. Pa. Sept. 27, 2004) *aff'd sub*

*nom*, *Winer Family Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007). "To prevail on a 'truth on the

market' defense at th[e] [motion to dismiss] stage of the litigation . . . defendants must establish

that defense as a matter of law on the basis of the allegations of the Amended Complaint[.]" *In re*

*Res. Am. Sec. Litig.*, No. 98-5446, 2000 WL 1053861, at *5 (E.D. Pa. July 26, 2000). Again, the Court is guided by its duty to accept all factual allegations as true and to construe the Amended Complaint in a light most favorable to Lead Plaintiffs. Given the strong inferences in favor of Lead Plaintiffs, the Court finds that it is inappropriate to rule at this stage whether the truth on the market defense applies. *See, e.g., Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

### e. Lead Plaintiffs Have Sufficient Plead Allegations Relating to Internal Controls

Finally, with respect to internal controls, Lead Plaintiffs allege that Enzymotec's February 13, 2014 Form 20-F included SOX certifications by Defendants Katz and Bryan, in which they certified in part that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report . . . ." (AC ¶ 110.)

Defendants argue that Lead Plaintiffs fail to explain how these SOX certifications were false or misleading. (Mov. Br. at 10 n.7.) Defendants contend that Lead Plaintiffs have failed to state a claim in part because Enzymotec has not restated any of its financial results and Enzymotec's independent auditors have never questioned Enzymotec's internal controls. (*Id.*)

Lead Plaintiffs counter that they have sufficiently stated a claim for relief with regard to

internal controls because they specifically allege that Defendants Katz and Bryan each falsely certified under Sarbanes-Oxley that Enzymotec maintained effective internal controls over financial reporting and that the Company's financial statements were accurate and fairly presented the Company's financial condition. (Opp. Br. at 18.) Lead Plaintiffs contend that Defendants had no reasonable basis for stating that Enzymotec's financial results did "not contain any untrue statement" and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of the Company. (*Id.*)

Given the early stage of the litigation and the requirement that it must give all inferences in favor of the plaintiff, the Court finds that Lead Plaintiffs have adequately pled that Defendants Katz and Bryan each falsely certified that Enzymotec maintained effective internal controls over financial reporting and that the Company's financial statements were accurate and fairly represented the Company's financial condition. (AC ¶¶ 110-13.) In particular, in contrast to the certifications, Lead Plaintiffs specifically allege that the internal controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior during the Class Period. (*Id.* ¶ 113.) The Court finds this sufficient in light of the fact that its role at this stage is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *Wilkins*, 659 F.3d at 302. (3d Cir. 2011).

2. Scienter

Defendants move to dismiss the Amended Complaint on grounds that Lead Plaintiffs have failed to adequately plead scienter. (Mov. Br. at 22-28 (citing AC ¶¶ 7, 21-23, 67, 79, 130, 149-50, 152); Reply Br. at 7-12.) Defendants first argue that Lead Plaintiffs present nothing more than generalized imputations of knowledge, and point out that Lead Plaintiffs rely on the speculative

assertions of an outside expert as opposed to a confidential witness, internal memorandum, or other Company source. (Mov. Br. at 22-23.) Defendants further contend that any allegations of scienter are undermined by both the timing of the new regulations and the fact that Biostime failed to accurately predict their impact. (*Id.* at 24-25.)

Additionally, Defendants argue that Lead Plaintiffs' attempt to plead scienter based upon the Officer Defendants' stock sales at an allegedly inflated price is without merit, since motive and opportunity alone cannot give rise to a strong inference of scienter. (*Id.* at 25-27.) Defendants assert that Officer Defendants "sold only 35% of their stock in the SPO, thereby remaining heavily invested in the Company by continuing to hold nearly 500,000 shares" and further note that the SPO took place in February 2014, approximately three months after Enzymotec's stock price reached its peak in December 2013. (*Id.* at 26.) Additionally, Defendants argue that Lead Plaintiffs have holistically failed to establish scienter since the Company expected continued sales growth in 2014, made large investments in its krill oil business and increased its raw materials inventory over 40% between the end of 2012 and 2013, provided early disclosure of its "disappointing" second quarter 2014 results, and reduced its guidance in May 2014 even when it had a good quarter. (*Id.* at 27.)

In response, Lead Plaintiffs argue that the Amended Complaint alleges compelling facts evidencing Defendants' knowledge and recklessness. (Pl. Opp. Br. at 22-25.) First, Lead Plaintiffs contend that because the alleged misstatements and omissions concerned Enzymotec's core business about which Defendants regularly spoke, knowledge may be imputed to individual defendants under the "core operations doctrine." (*Id.* at 22-23.) Additionally, Lead Plaintiffs argue that Defendants were in possession of information regarding the Chinese regulations that

36

"undercut their public statements regarding Enzymotec's operations in the Chinese markets, strength in its relationships with its then-current customers, and its ability to attract new customers." (*Id.* at 24-25.)

Furthermore, Lead Plaintiffs contend that Defendants were motivated to commit fraud in order to inflate the Company's stock price for purposes of profiting through the SPO. (*Id.* at 25-29.) The Amended Complaint alleges that, through the SPO, a total of ten insiders profited by selling 1.94 million shares for gross proceeds of approximately $54.3 million, which represented 58% of the shares that these insiders collectively owned at the time, and that Defendants Katz (233,526 shares) and Bryan (51,802 shares) sold significant amounts of shares for nearly $8 million, representing respectively 35% and 42% of their holdings. (*Id.* at 25-27 (citing AC ¶ 67).) Lead Plaintiffs argue that these amounts are suspicious, even if the insiders did not liquidate all of their shares, especially since the SPO was announced almost contemporaneously with the Company's announcement of record financial results in February 2014. (*Id.*)

Additionally, Lead Plaintiffs note that Defendants are primarily located in Israel, with the operational events in Israel, Sweden, and China, and point to the relaxed particularity rules in situations where information is peculiarly within a defendant's knowledge or control. (*Id.* at 27.) Lead Plaintiffs further allege that Defendants are being disingenuous when they attempt to distance themselves from the infant formula market, especially given the importance of InFat to the Company's business. (*Id.* at 28.)

As noted, "each act or omission alleged to violate [Section 10(b)], [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. § 78u4(b)(2). Scienter is a "mental state embracing intent to

deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In evaluating whether a complaint meets this requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. A "strong" inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. . . . The inference . . . need not be refutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 314, 324.

The Third Circuit permits a plaintiff to satisfy this requirement with allegations of strong circumstantial evidence of either conscious behavior or recklessness. *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000); *see also In re Radian Sec. Litig.*, 612 F.Supp.2d 594, 607 (E.D. Pa. 2009) (noting that although in *Tellabs* the Supreme Court specifically reserved the question of whether recklessness could give rise to civil liability under 10b–5, "every court of appeals to consider the issue has held that a plaintiff can meet the scienter requirement by showing that a defendant acted intentionally or recklessly.") In this context, recklessness is "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *S.E.C. v. Infinity Grp. Co.*, 212 F.3d at 192. Finally, a court considers the entirety of a complaint in determining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." *Tellabs I*, 551 U.S. at 322; *see also Avaya*, 564 F.3d at 273.

The Court finds that when considering the Amended Complaint in its entirety, Lead

Plaintiffs have adequately pled scienter. As an initial matter, Lead Plaintiffs have alleged that the matter at issue is central to the core business of the Company,[17] about which Defendants spoke regularly.[18] Although such allegations are not sufficient in and of themselves to show scienter, the Court keeps them in consideration when viewing the entirety of the Amended Complaint. *See Mill Bridge V, Inc. v. Benton*, No. 08-2806, 2009 WL 4639641, at \*31 (E.D. Pa. Dec. 3, 2009) ("[W]hile a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter.")

Most compelling to the Court when viewing the Amended Complaint holistically are the allegations surrounding the SPO. Although motive or opportunity "may no longer serve as an independent route to scienter," *Avaya,* 564 F.3d at 277-78, Lead Plaintiffs have specifically alleged that Defendants Katz and Bryan sold large amounts of shares for significant personal financial gain and that the sales were unusual in scope and timing. *See Tellabs*, 551 U.S. at 325 (noting that "personal financial gain may weigh heavily in favor of a scienter inference"); *In re Advanta*, 180 F.3d at 540 ("[W]e will not infer fraudulent intent from the mere fact that some officers sold stock. But if the stock sales were unusual in scope or timing, they may support an inference of scienter.") (citing *In re Burlington Coat Factory*, 114 F.3d at 1424) (internal citations and punctuation marks omitted); *see also In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (reviewing complaint for allegations that stock sales were "unusual in scope (*e.g.*, compared to their total level of compensation or the size of previous sales) or timing (*e.g.*, compared to the timing of past

---

[17] *See* AC ¶¶ 26, 29, 32, 34 (noting that Nutrition segment made up 96% of Company's revenues in 2012, with InFat and krill oil sales comprising the vast majority of the segment); *see also id.* ¶¶ 28, 93 (suggesting that the Company viewed itself as a participant in the infant formula industry, despite its corporate structure).

[18] *See, e.g.*, AC ¶ 47 (statement from Defendant Katz regarding financial outlook).

trades)").

In particular, the Amended Complaint alleges that as part of the SPO, Defendant Katz sold 233,526 shares, or 35% of his total holdings, for gross proceeds in excess of $6.5 million; Defendant Bryan sold 51,802 shares, or 42% of his total holdings, for gross proceeds of $1.45 million. (AC ¶ 67.) Furthermore, Lead Plaintiffs have specifically alleged that these sales were "suspiciously-timed" (*id.*), in that they occurred at a time when the price of the stock was allegedly artificially inflated due to Defendants' misrepresentations concerning the impact of the Chinese regulations. For example, Lead Plaintiffs allege that the SPO was announced on February 13, 2014: five months after the IPO, the same day as favorable guidance (*id.* ¶ 48), the same day that Defendant Katz stated that "[f]or fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance. . . . Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position" (*id.* ¶ 47), and the same day that the Company stated that it "expects net revenues to continue to grow on a sequential basis throughout the year." (*Id.* ¶ 49.) Crucially, Lead Plaintiffs specifically tie together the timing of these sales with the core of the alleged misrepresentations: at the time of the SPO, Defendants were aware, or should have been aware, of the severe negative impact that the impending Chinese regulations would have on the Company's business. (*Id.* ¶¶ 55-65.) Furthermore, Lead Plaintiffs allege that the truth about the impact of the regulations was fully revealed six months after the SPO, at which point the price of the shares tanked. (*Id.* ¶¶ 68-82.) Thus, Lead Plaintiffs allege that when the SPO was effectuated, the price of the stock was inflated as a result of the misrepresentations.

The allegedly suspiciously timed stock sales are bolstered by the declaration of Dr.

Mingruo Guo, which Lead Plaintiffs attach to the Amended Complaint to support their contentions that Defendants should have known of, and anticipated, the true impact of the regulatory changes. (AC, Ex. A). Although the declaration of an outside expert of a food scientist such as Dr. Guo is admittedly not as strong as a confidential witness, the declaration of Dr. Guo only serves to supplement the allegations contained in the Amended Complaint,[19] especially where the operational events occurred in Israel, Sweden, and China. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418 ("[T]he normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control.").

The particularized allegations before this Court of motive viewed in the context of the Amended Complaint as a whole are compelling. In short, the allegations significantly enhance the inference of scienter, especially when read in light of relevant Third Circuit precedent. *See Avaya*, 564 F.3d at 279 (concluding that allegations concerning stock transactions did not significantly enhance the inference of scienter where defendants sold 1.7% and 17.7% of their respective holdings and "trading practices remained consistent year-over-year"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (concluding that allegations that stock sales were suspiciously timed since they occurred six weeks before defendants retired, occurred at artificially high prices as a result of the scheme, and resulted in significant personal gain of approximately $7 million were sufficient to survive motion to dismiss, despite the fact that defendants had retained significant percentage of stock holdings).

Upon a holistic consideration of the allegations contained in the Amended Complaint, the

---

[19] *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) *cert. denied sub nom. Amedisys, Inc. v. Pub. Employees' Ret. Sys. of Mississippi*, 135 S. Ct. 2892 (2015) (noting use of declaration of outside expert).

Court finds that a reasonable person would deem the inference of scienter at least as strong as any opposing inference. *See Tellabs*, 551 U.S. at 314, 326. Accordingly, the Court finds that Lead Plaintiffs have adequately alleged a claim under Section 10(b) and Rule 10b–5 of the Securities Exchange Act, sufficient to allow the claim to proceed at this time.

**B.   Control Person Claim Against the Officer Defendants under § 20(a) of the Securities Exchange Act[20]**

Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b). 15 U.S.C. § 78t(a); *In re Suprema*, 438 F.3d at 284. Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person. *Avaya*, 564 F.3d at 252; *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.") (internal quotation marks omitted).

Because the Court has found Lead Plaintiffs have adequately alleged a violation of the Securities Exchange Act, it likewise finds that Lead Plaintiffs Plaintiff have sufficiently stated a claim for control liability under Section 20(a). *See In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 418 (D.N.J. 2004). Accordingly, the Court will deny Defendant's motion to dismiss this claim.

**C.   Securities Act Claims[21]**

The Securities Act creates federal duties related to the registration and disclosure of public offerings. *In re Suprema*, 438 F.3d at 269 (citations and quotation marks omitted). Lead Plaintiffs assert claims arising under the following sections of the Securities Act: Section 11, Section

---

[20] The § 20(a) claim is asserted against the Officer Defendants. (AC ¶¶ 133-38.)
[21] The § 11 claim is alleged against all Defendants (AC ¶¶ 169-81); the § 12(a)(2) claim is alleged against Enzymotec (AC ¶¶ 182-89); and the § 15 claim is alleged against the Individual Defendants (AC ¶¶ 190-95).

12(a)(2), and Section 15. (AC at 60-74.) Sections 11 and 12(a)(2) of the Securities Act "impose civil liability for the making of materially false statements in registration statements and prospectuses." *In re Adams Golf Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004); *see* 15 U.S.C. §§ 77k, 77l(a)(2). In addition, Section 15 allows a plaintiff to bring a claim for "control liability" against a person who controls a person liable for an underlying violation of the Securities Act. *See In re Suprema*, 438 F.3d at 284-85.

Section 11 of the Securities Act concerns material misstatements or omissions in registration statements. 15 U.S.C. § 77k(a). Under Section 11, "a private action for damages may be brought 'by any person acquiring such security' if a registration statement, as of its effective date: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statements therein not misleading.'" *In re Suprema*, 438 F.3d at 269 (quoting 15 U.S.C. § 77k(a)). Furthermore, a Section 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement. *Id.* Section 11 is a "virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 n. 7 (3d. Cir. 2004). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *In re Suprema*, 438 F.3d at 269 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Section 12(a)(2) provides civil liability for anyone who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15

U.S.C. § 77l(a)(2).  Thus, to state a claim under section 12(a)(2), a plaintiff must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication.  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004) (internal citations and quotations omitted).  And, like section 11, section 12 is a "virtually absolute" liability provision which does not require a plaintiff to allege that the defendants possessed scienter, and instead requires only rather, only that the plaintiff made the purchase pursuant to a materially false or misleading prospectus or oral communication.  *In re Adams Golf*, 381 F.3d at 274 & n.7.

Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12.  *See* 15 U.S.C. § 77o; *see also, In re Adams Golf*, 381 F.3d at 273 n.3.  To state a claim under § 15, plaintiffs must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws.  *In re Suprema*, 438 F.3d at 284.

Section 11 and 12(a)(2) claims are generally not subject to the heightened pleading standards required under the PSLRA and Federal Rule of Civil Procedure 9(b); rather, the liberal notice pleading requirements of Rule 8 generally apply.  *See In re Suprema*, 438 F.3d at 269-70 (citations omitted).  However, "where the plaintiff grounds [the] Securities Act claims in allegations of fraud—and the claims thus 'sound in fraud'—the heightened pleading requirements of Rule 9(b) apply." *Id.* (citing *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 161–63 (3d Cir.2004) ("CALPERS")).  However, if the allegations are pled separately and plaintiffs expressly premise Securities Act claims on negligence rather than fraud, Rule 9(b) is inapplicable. *Id.* at 272, 273 ("[W]here . . . individual defendants are accused in separate claims of the same complaint as having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act

44

claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims.") *Id.* at 273.  In *In re Suprema* the plaintiff carefully separated its allegations of negligence from its allegations of fraud against the same defendants by "pleading its Section 11 and Section 12(a)(2) claims in negligence before—and wholly apart from—pleading its fraud-based Section 10(b) claims." *Id.*

Here, the Amended Complaint similarly separates the factual allegations supporting the Securities Act claims from those supporting the Exchange Act claims. (*See* Compl.)  The Section 10(b) claims are pled before the Section 11 and 12(a)(2) claims. (*Id.*)  The Securities Act claims are prefaced by the following statement: "In this part of the Complaint, Lead Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act . . . [and] expressly disclaim any allegations of knowing or reckless misconduct[.]"  (AC ¶ 139.)  Accordingly, the Court finds that Plaintiff has pled its Securities Act claims in a manner sufficient "to avoid triggering Rule 9(b)." *In re Suprema*, 438 F.3d at 273.

Keeping in mind the elements to state a claim and the requirement that the Court must accept all factual allegations as true at this stage, the Court finds that Lead Plaintiffs have sufficiently pled these causes of actions to survive the instant motion to dismiss. (*See* AC ¶¶ 169-81 (Section 11); *id.* ¶¶ 182-89 (Section 12(a)(2)); *id.* ¶¶ 190-95 (Section 15).)

With respect to standing for these claims, Lead Plaintiffs specifically allege that they purchased Enzymotec securities issued in, or traceable to, the offering of Enzymotec securities that were conducted pursuant to either the IPO or SPO. (AC ¶¶ 141-43.)  In the Third Circuit, the question of determining standing through tracing is a "factual one, to be resolved through discovery, as to whether plaintiffs can demonstrate that the shares they allegedly purchased are in

fact traceable to the registration statement alleged to be false and misleading." *In re Suprema*, 438 F.3d at 274 n.7 (concluding that plaintiffs' assertions of purchases "in" and "traceable to" the Suprema stock offerings were sufficient at the pleading stage). "If, as appellees suggest, plaintiffs have misrepresented the circumstances of their stock purchases and do not in fact have standing, appellees can raise that matter at the summary judgment stage after discovery." *Id.* Accordingly, accepting all allegations in the Amended Complaint as true at this stage as it must, the Court finds that Lead Plaintiffs have adequately alleged standing.

Furthermore, as discussed above in Part A, *supra*, Lead Plaintiffs have adequately alleged that the Prospectuses contained untrue statements or omissions of material facts. For example, even though Defendants warned generally of "significant and increasing government regulations" and specifically identified the Ministry of Health in China in their SPO Prospectus, Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect. (*See* AC ¶¶ 165-68; *see also id.* 161-64.) Additionally, the Court declines to rule on whether the truth-on-the-market doctrine applies at this stage and believes that discovery is necessary to determine that doctrine's applicability. *See, e.g., Ganino*, 228 F.3d at 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").[22] Accordingly, the Court denies the Motion to Dismiss the Securities Act claims.[23]

---

[22] *See also* Todd R. David, Jessica P. Corley, Ambreen A. Delawalla, *Heightened Pleading Requirements, Due Diligence, Reliance, Loss Causation, and Truth-on-the-Market - Available Defenses to Claims Under Sections 11 and 12 of the Securities Act of 1933*, 11 Transactions: Tenn. J. Bus. L. 53, 87-91 (2010).

[23] Although Defendants argue that the claim against Defendant Gilead Fortuna must be dismissed because he was no longer a director of Enzymotec when the registration statement for the IPO went effective (Mov. Br. at 29 n.19), the Court denies the motion at this time. Even though Lead Plaintiffs did not directly respond to this point, Defendants do not cite to anything which would allow the Court to confirm this contention. Accordingly, the Court denies the

## **CONCLUSION**

For the reasons above, the Court grants in part and denies in part the Motion to Dismiss.

An appropriate Order accompanies this Opinion.

DATED: December 14, 2015

                                                JOSE L. LINARES
                                                UNITED STATES DISTRICT JUDGE

---

motion with respect to Defendant Fortuna at this time but permits to Defendants to remove at summary judgment.